LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fasx: (702) 382-1169

Proposed Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>BOUTIQUE NV, LLC,<br><br>Debtor. | Case No. 21-13050-nmc<br>Chapter 11<br><br>Date:  OST REQUESTED<br>Time:  OST REQUESTED |

**OMNIBUS DECLARATION OF DEANNA CROSSMAN IN SUPPORT OF**
**DEBTOR'S INITIAL EMERGENCY MOTIONS AND RELATED RELIEF**

I, Deanna Crossman, hereby declare as follows:

1. I am over the age of 18 and am mentally competent. I make this declaration in support of the initial emergency motions requesting various types of immediate relief (collectively, the "Initial Motions") filed by Boutique NV, LLC, a Nevada limited liability company, as debtor and debtor in possession (the "Debtor"), in its chapter 11 bankruptcy case (the "Chapter 11 Case"), as well as such other relief as may be requested during the case.

2. I am the Debtor's President, and one of its Managers along with my husband Colin Crossman. Based upon my positions and experience with the Debtor, I am readily familiar with Debtor's operational and financial affairs. All facts set forth in this declaration are based upon my own personal knowledge of the Debtor's operations and finances, or information learned from my review of relevant documents maintained in the ordinary course of the Debtor's business and which are business records. If called upon to testify as to the contents of this declaration, I could

and would do so consistently herewith.

3. This declaration provides the Court with certain background information regarding Boutique, as well as the context for various relief requested. Accordingly, the declaration is organized into two parts: first, an overview of Boutique, its operations, organizational structure, and the events leading to its Chapter 11 Case, and second, an explanation of the relief sought in the Debtor's Initial Motions.[1] The relief sought in the Initial Motions is critical to the Debtor's operations, will allow for a smooth transition into chapter 11, and will help to ensure that the Debtor is provided the opportunity to reorganize successfully.

**I. Background**

**A.    Business Overview and Management.**

4. The Debtor owns and operates The Retreat on Charleston Peak, which is a sixty-two (62) room hotel located at 2755 Kyle Canyon Road, Las Vegas, Nevada 89124, APN 128-28-304-001 (the "Hotel"). The Hotel is a rustic lodge elevated 6,700 ft. above sea level in the Kyle Canyon area situated on 5.76 acres of land near Mount Charleston, and is 45 minutes away from the Las Vegas Strip. The Hotel also offers various amenities, including the Canyon Restaurant & Tavern Bar, a full-service restaurant and bar with restricted gaming, and a 5,100 square foot event space and outdoor deck for wedding or commitment ceremonies, conferences, and other events. The Hotel also has a spa, which has been closed during the COVID-19 pandemic, but which the Debtor will be re-opening soon.

5. The Debtor is managed by my husband, Colin Crossman and me (collectively, the "Crossmans"), who are experienced hoteliers who previously owned various hotels in North Carolina, and who first acquired the Hotel in 2018. The Hotel experienced a sharp downturn in revenue given its inability to host events and large gatherings during the COVID-19 pandemic and state-mandated closures, and thus fell behind on its debt service leading to a noticed foreclosure sale for the property, and this bankruptcy was filed to stay that foreclosure and allow for a restructuring of its secured debt. In addition to the Crossmans, who own 55.25% of the

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant Initial Motions, all of which are being filed contemporaneously herewith.

2

membership interests in the Debtor, the Debtor also has seven (7) other members who collectively hold the remaining 44.75% of its membership interests.

**B.     Relevant Pre-Petition Events.**

6.     On or about June 26, 2018, Mt Charleston Landlord, LLC ("MCL"), as predecessor to the Debtor,[2] acquired the Hotel from its prior owner for a purchase price of $4,500,000, which purchase was financed, in part, by an entity called Mountain West Debt Fund, LP, as lender (the "Secured Lender").  The Secured Lender is an affiliate of Taylor Derrick Capital, a private equity group with offices in Henderson, Nevada and Salt Lake City, Utah.

7.     On or about June 26, 2018, the parties entered into a Term Loan Agreement (the "Loan Agreement") in the original principal amount of $3,530,000 (the "Loan"), with the debt evidenced by a Secured Promissory Note (the "Note"), and secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Deed of Trust" or "Security Agreement" as applicable) that was recorded against the Hotel in the Official Records of the County Recorder, Clark County, Nevada (the "Official Records") on June 27, 2018 as Inst# 20180617-0000162.

8.     The Note was for a one (1) year term and thus with a maturity date of June 26, 2019, but with an available three (3) month extension under certain conditions.  The Note required monthly interest-only payments, and accrued interest at the rate of fourteen percent (14%) per annum at the regular contract rate.  In the event of a default, the loan provided for a twenty percent (20%) default rate of interest, plus a 5% late fee and other charges.  Pursuant to the Deed of Trust and Security Agreement, the Secured Lender was granted a security interest in substantially all of the real and personal property owned by borrower to secure repayment of the debt.  The obligations under the foregoing loan documents were also personally guaranteed by the Crossmans.  True and correct copies of the Loan Agreement, Note, and Deed of Trust are attached as **Exhibit 1**, **Exhibit 2**, and **Exhibit 3**, respectively.

9.     On or about June 26, 2019, the parties entered into a Loan Modification Agreement (the "Loan Modification Agreement"), which increased the loan amount to $4,525,000, permitted

---

[2] MCL later merged into the Debtor, thereby making all of its obligations the Debtor's responsibility.

the borrower to draw available loan proceeds o $300,000, and extended the maturity date for six (6) months to December 26, 2019 for an extension fee of $101,812.50. The Debtor used these additional monies to fund certain limited improvements at the Hotel. A true and correct copy of the Loan Modification Agreement is attached as **Exhibit 4**.

10. On or about October 2, 2019, the Secured Lender recorded a Modification of Deed of Trust consistent with the increased amount of indebtedness in the Loan Modification Agreement in the Official Records on October 2, 2019 as Inst# 20191202-0002546. A true and correct copy of the Modification is attached as **Exhibit 5**.

11. The loan to the Secured Lender was not repaid when it was due in December 2019.

12. Due to the COVID-19 pandemic and related state Governor-ordered closures as a result, the Hotel was required to completely ceased *all* operations for a period of more than two (2) months from March 17, 2020 through May 25, 2020. Additionally, from May 25, 2020 through June 1, 2021, and thus more than a year thereafter, the Hotel was able to reopen, but only on a limited and "phased" basis, except for the spa, which has remained closed and will not reopen until August. The foregoing closure and limited operations severely impacted the Debtor's operations and its ability to service its debt to the Secured Lender and other obligations.

13. On July 27, 2020, the Nevada Employment Security Division obtained a Judgment against the Debtor in the Eighth Judicial District Court, Clark County, Nevada, Case No. A-20-8169130C in the amount of $21,833.53 for unpaid contributions to the Nevada Unemployment Compensation Fund, which Judgment was recorded in the Official Records on July 29, 2020 as Inst# 20200729-0000994. A true and correct copy of this recorded judgment is attached as **Exhibit 6**.

14. During the COVID pandemic, the Hotel did what it could to survive, including obtaining two round of Paycheck Protection Program fundings, and a small grant, however, the Hotel still struggled significantly. The Hotel also attempted to work out some kind of arrangement with the Secured Lender to forbear or restructure the loan, however, the Secured Lender demanded a $1,000,000 paydown of its loan in order for that to happen, which the Hotel obviously could not afford given that it was still reeling from the pandemic.

4

15. On February 4, 2021, and thus more than a year and a half after the original loan was made, the Secured Lender filed a UCC-1 Financing Statement with the Nevada Secretary of State, thereby purporting to perfect a security interest in "all assets of Debtor." A true and correct copy of this financing statement is attached as **Exhibit 7**.

16. On February 19, 2021, the Secured Lender recorded a Notice of Breach and Default and of Election to Cause Sale of Real Property Under Deed of Trust (the "Notice of Default") against the Hotel, which was recorded in the Official Records as Inst# 20210219-0001397. A true and correct copy of the Notice of Default is attached as **Exhibit 8**.

17. On May 24, 2021, the Secured Lender recorded a Notice of Trustee's Sale (the "Notice of Sale") against the Hotel, which was recorded in the Official Records as Inst# 20210524-0001292, which noticed a trustee's sale of the Hotel and all related personal property in a unified sale scheduled for June 17, 2021. A true and correct copy of the Notice of Sale is attached as **Exhibit 9**.

18. The Secured Lender is claiming that the Loan has now ballooned to not less than $6.65 million as of the Petition Date, inclusive of default interest, late fees, and costs.

19. The Debtor filed for bankruptcy the day prior to the Secured Lender's foreclosure sale in order to avoid the Hotel being lost, thus staying the sale by operation of the automatic stay in section 362 of the Bankruptcy Code.

## II. Initial Motions

A. **Introduction.**

20. The Debtor's transition into Chapter 11 must be effectively organized to ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from this Chapter 11 Case. Accordingly, it is critical that the Debtor maintains a strong relationship with the community, its customer, vendors, creditors, and such other parties that enable the Debtor to conduct its business. To maintain and foster these relationships, it is important to minimize the distractions to the Debtor's business operations that could result from the Debtor's petitioning for Chapter 11 relief.

21. I have reviewed and am generally familiar with the contents of each of the Initial

Motions as hereinafter described. Based on that familiarity and information supplied to me by other members of Debtor's legal advisors, I believe that the relief sought in each of the Initial Motions is necessary to enable Debtor to operate in this Chapter 11 Case with minimal disruption and loss of value, and further must be approved on an emergency basis in order to avoid immediate and irreparable harm to the Debtor's operating Hotel business and related operations.

**B.     Cash Collateral Motion.**

22.     As illustrated by the Budget, the Debtor is only seeking to use alleged cash collateral to preserve, maintain and operate its Hotel and related business in the ordinary course of the business. Each expense included in the Budget is a necessary and appropriate to the business, which is Debtor's sole means of generating revenue. Additionally, during what is anticipated to be the Debtor's very brief period while it is in bankruptcy, the Debtor proposes to make a monthly adequate protection payment to the Secured Lender in the amount of $25,000 (the "Adequate Protection Payment") on or before the 5th calendar day of each and every month during the pendency of the Chapter 11 Case. Additionally, the Debtor will be filing its proposed Plan of Reorganization within the first few weeks of the bankruptcy case, and thus with the aim of having a confirmation hearing scheduled within ten (10) weeks of the Petition Date, thus mitigating any imposition on the Secured Lender even further. Accordingly, the Debtor should be granted authority to use cash collateral consistent with the Budget and the other terms and conditions as set forth herein, as such use to maintain the business itself provides the secured creditors, to the extent they have interests entitled to protection, with adequate protection.

23.     No creditor, including the Secured Lender, has a properly perfected security interest in any of the Debtor's cash held in its deposit accounts as of the Petition Date, because no creditor had possession or control of such funds, such as by way of a deposit account control agreement.

24.     If the Debtor is unable to obtain the immediate use of cash collateral and is denied the ability to use the income generated from the business pending the Final Hearing, it will be unable to maintain and operate its Hotel and the Debtor will be forced to cease business operations with a concomitant immediate and irreparable harm to the value of the business and ultimately the estate and its creditors.

**C.      Employee Wages Motion.**

25.     As of the Petition Date, the Debtor employs on approximately 42 employees (collectively, the "Employees"), all of which are full-time, and in the ordinary course of its business whose continued service is vital to Debtor's ongoing operations and reorganization efforts. As of the Petition Date, the Employees were owed or had accrued in their favor, various sums for wages and salaries incurred in the ordinary course of the Debtor's business and operations, including prepetition compensation (collectively, the "Wage Obligations").

26.     The total estimated amount of Wage Obligations that will have accrued but remain unpaid as of the Petition Date is approximately $54,000, which represents the pay period of June 1, 2021 through June 14, 2021, plus two (2) additional days of the pay next pay period. The Debtor pays its Employees twice a month, on the 9th and the 23rd of each month. For example, Boutique's specific payroll period for which it seeks authorization and approval to pay in this Motion is from June 1, 2021 through June 14, 2021, which is to be paid on June 23, 2021, plus two days on the payroll period ending June 30, 2021, and paid on July 9, 2021, and thus encompasses sixteen (16) days pre-petition, including the Petition Date. The Debtor seeks authorization to continue to pay these Wage Obligations in the ordinary course of business.

27.     The Debtor is required by law to withhold from the Employees' wages amounts related to federal and state income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities. To the extent that the Debtor has deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, the Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business. In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance. For the pay period in question, these sums total approximately $5,700. The Debtor seeks authorization to continue to pay or turn over these funds to the applicable

authorities in the ordinary course of business.

28. In the ordinary course of its business, the Debtor also accrues amounts for contributions to health and benefit programs and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (collectively, the "Employee Benefit Plans"). These benefits include health plans (*i.e.* medical, dental, vision, and life insurance), various welfare plans (*i.e.* life insurance, disability insurances, accidental death and dismemberment insurance), and other employee assistance programs. These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled. The amount of Employee Benefit Contributions that will have accrued, but will remain unpaid, prior to the Petition Date are estimated to be 1,250. The Debtor seeks authorization to continue to pay such Employee Benefit Contributions in the ordinary course of business.

29. In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor (the "Reimbursable Business Expenses"). The Chapter 11 Case was filed during the Debtor's normal payroll periods for hourly and salaried Employees and during their normal reimbursement cycle for Reimbursable Business Expenses. Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed. The Debtor is currently unaware of any Reimbursable Business Expenses as of the Petition Date, however, if it is determined that such Reimbursable Business Expense does exists, such amount would not exceed $500. The Debtor seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business provided that they do not exceed, in the aggregate, the foregoing estimate.

30. The Wage Obligations, and Employee Benefit Contributions to be paid to or for the benefit of each of the Employees will not exceed $13,650.00 per employee, consistent with the cap provided in section 507(a)(4) of the Bankruptcy Code.

31. Finally, under the laws of the State of Nevada, the Debtor is required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising

from or related to their employment with the Debtor. The Debtor currently maintains an annual workers' compensation policy (the "Workers' Comp Policy") pursuant to which it provides workers' compensation insurance coverage up to the statutory limits and up to $500,000 per occurrence for employer liability. The current term of the Workers' Comp Policy runs through January 8, 2022, and costs approximately $17,305 on an annual basis, with $1,735 payable monthly. As of the Petition Date, the Debtor is current on its Workers' Comp Policy. The Debtor hereby seeks authority to maintain its Workers' Comp Policy in accordance with applicable law post-petition and to pay all premium installments as they come due in the ordinary course of business.

32.     If Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date, there is a significant risk that essential Employees will resign and that those Employees that remain will be discontented and demoralized. As such, continued payment of Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses, Worker's Comp Policy and other matters set forth herein is essential to maintain positive relations between Debtor and its Employees, as well as to comply with applicable State law. If the relief requested herein is not granted, the success of Debtor's ongoing operations and reorganization will be placed in substantial jeopardy, and the Debtor will likely be in violation of various State laws. Thus, the relief request herein in the best interests of the of Debtor, its estate, its creditors, and all other parties in interest.

**D.     Hotel Deposits and Travel Agent Commissions Motion.**

33.     As of the Petition Date, the Debtor estimates that it is holding Customer Deposits in the amount approximately $199,006.08 and Travel Agent Commissions of approximately $8,000.

34.     Part of the Debtor's revenue is derived from its hotel room rentals and its private events sales. For the period of January 2021 through the Petition Date, the Debtor has generated revenue from its gross room rental in the amount of $391,624.23, an amount that is up from this time last year.

35.     As set forth in the Budget, for the four-month period commencing on the Petition

Date and concluding on October 31, 2021, the Debtor's Budget included with its cash collateral motion anticipates positive net ordinary income, and thus positive cash flow after payment of normal operating expenses as well as a significant Adequate Protection Payment to the Secured Lender.

36. As of the Petition Date, prospective guests had placed deposits for hotel rooms they intended to occupy. Some of these hotel room reservations had been placed by travel agencies, which pursuant to commission agreements, are entitled to receive commissions when such sites are occupied and the customers pay their bills. The Debtor requests that the Court enter an order permitting it, without further order of this Court, to honor all prepetition Customer Deposits and Travel Agent Commissions.

37. Maintaining the satisfaction and goodwill of prospective guests is imperative to the success of any reorganization by Debtor. If Debtor is unable to honor advance deposits for hotel room reservations, its operations will be severely affected.

38. Likewise, travel agents will be unlikely to direct their future customers to Debtor if prepetition deposits and commission agreements are not honored. Consequently, maintaining the satisfaction and confidence of travel agents is important to Debtor's on-going business operations and the success of any reorganization by Debtor.

39. As set forth in the Budget, the Debtor will have sufficient cash on hand and in its bank accounts to honor all of the foregoing Customer Deposits and Travel Agent Commissions as they come due.

E. **Utilities Motion.**

40. In the ordinary course of operating the Debtor's business and the operation of its Hotel and related amenities, the Debtor incurs utility expenses for water and sewer, electricity, natural gas, internet and phone, and waste management. In particular, the Debtor has 62-room hotel, bar/restaurants, event space, and common areas. These utility services are provided by the utilities (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers"), and inclusive of water/sewer, electric, natural gas, internet, telephone, and waste removal.

41. On average, the Debtor expends approximately $14,000, in the aggregate, each month on utility costs. As of the Petition Date, the Debtor is current on all of its utility obligations owed to its current utility providers, and except for accrued amounts that have not been billed as of yet. Additionally, because the Debtor has kept its accounts current, the Debtor has not been required to post any deposits with its Utility Providers.

42. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to continue maintaining its stores, thereby negatively affecting customer relationships, revenues and profits. Such a result could jeopardize the Debtor's reorganization efforts and, ultimately, value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during the Chapter 11 Case.

43. The Debtor intends to pay its post-petition utility obligations owed to the Utility Providers in a timely manner and keep them current on a go forward basis from and after the Petition Date. The Debtor expects that it will have access to such funds from operations to pay post-petition obligations to the Utility Providers. Given the monthly obligations to Utility Providers, the Debtor asserts that there is no need to provide any additional assurance of payment for future services to the Utility Providers that did not hold deposits from the Debtor on the Petition Date.

44. Given the long account history, and the monthly obligations to the Utility Providers, the Debtor asserts that there is no need to provide any additional assurance of payment for future services to the Utility Providers who did not hold deposits from the Debtor on the Petition Date.

45. Notwithstanding the Proposed Adequate Assurance for the Utility Providers, if the Utility Providers are not satisfied that they have received adequate assurance of future payment, the Debtor proposes the procedures (the "Procedures") as specified in the Motion, which such dissatisfied Utility Provider may make additional requests for adequate assurance.

46. The Debtor further requests that all Utility Providers be prohibited from altering, refusing, or discontinuing utility services to the Debtor absent further order of the Court.

47. The Debtor believes it will have sufficient resources to pay, and intends to pay, all

valid post-petition utility obligations for utility services in a timely manner. In addition, the Debtor has a powerful incentive to stay current on its utility obligations because of the Debtor's reliance on utility services for the operation of its cleaning and sanitizing equipment. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payment is required in this Chapter 11 Case (the "Proposed Adequate Assurance"). In light of the foregoing, the Debtor respectfully submits that the Proposed Adequate Assurance for the Utility Providers are more than sufficient to assure the Utility Providers of future payment.

48. Moreover, if a Utility Provider disagrees with the Debtor's analysis, the Procedures will enable the parties to negotiate and, if necessary, seek Court intervention without jeopardizing the Debtor's continuing operations. If a Utility Provider fails to timely file a Request in accordance with the Procedures, however, such Utility Provider shall be deemed to consent to the Procedures and shall be bound by any order approving this Motion.

49. The proposed Procedures are necessary for the Debtor to carry out its reorganization efforts. If such Procedures are not approved, the Debtor could be forced to address a volume of requests by its Utility Providers during the critical first weeks of its reorganization. Moreover, the Debtor could be blindsided by a Utility Provider unilaterally deciding--on or after the 30th day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service would force operations to cease, and such disruption of operations could place the Debtor's reorganization efforts in jeopardy.

F. **Cash Management Motion.**

    (1) **The Cash Management System.**

50. To manage its business efficiently and seamlessly, the Debtor utilizes a cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business. The Cash Management System facilitates Debtor's cash monitoring, forecasting, and reporting. In connection with the Cash Management System, the Debtor proposes to maintain control over the

administration of its bank accounts and at the banks indicated herein.

51.     In the ordinary course of business prior to the Petition Date, the Debtor used the Cash Management System, which is similar to those utilized by other companies, to collect, transfer, and distribute funds generated by Debtor's business operations efficiently. In the ordinary course of business, the Debtor accurately recorded such collections, transfers, and disbursements as they were made. Currently, the Debtor has numerous bank accounts with various institutions as follows: three (3) checking accounts with First Horizon Bank; and one (1) checking account with Wells Fargo Bank (collectively, as applicable the "<u>Banks</u>" and the "<u>Bank Accounts</u>").

52.     Some of the Debtor's customers use credit cards to make payments. Thus, the Debtor also has a merchant account through which payments made through credit card companies are processed. The Debtor has been advised that it would take a substantial amount of time to obtain a new merchant account. Hence, if the Debtor is not permitted to continue to use the merchant account as debtor-in-possession, it could not offer its customers the service of allowing them to pay its bills by credit card for whatever period of time it would take for Debtor to obtain new a merchant account. The absence of credit card services even for a short period of time would materially and adversely affect Debtor's business. As of the Petition Date, customer drafts relating to such credit cards were in various stages of collection. To obviate the disruption that might otherwise occur in the collection process, it is in the best interest of the estates to be authorized to continue to its ordinary course credit card transactions, rather than to close this account and then open a new account.

53.     Given the complexity of the existing Cash Management System and the confusion and inefficiency that would be caused by trying to change it, the Debtor has determined to continue its prepetition cash management practices in the post-petition period to a large extent. Debtor's Cash Management System constitutes ordinary course, essential business practices providing significant benefits to Debtor including, *inter alia*, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and

adverse impact upon Debtor's value.

54. The Debtor will maintain its books and records relating to the Cash Management System to the same extent the books and records were maintained before the Petition Date. In this way, all transfers and transactions will be properly documented, and accurate balances will be maintained. As a result, the Debtor will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest. Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System is in the best interests of its estate, and all creditors and parties in interest. Therefore, the Debtor seeks authority to maintain and use its Cash Management System during its Chapter 11 Case.

**(2)    The Need to Honor Prepetition Obligations Related to Cash Management.**

55. In connection with its use of the Cash Management System, the Debtor incurs periodic service charges and other fees to the Banks for the maintenance of the Cash Management System (the "Service Charges"). The Debtor is unaware of any unpaid prepetition Service Charges as of the Petition Date. However, out of abundance of caution, the Debtor hereby requests authority to pay the prepetition Service Charges, if any, that remain unpaid as of the Petition Date. Payment of the prepetition Services Charges is in the best interests of the Debtor, its estate and all parties in interest as it will prevent any disruption to the Cash Management System. Because the Banks have setoff rights with respect to the Service Charges, payment of any prepetition Service Charges would not affect unsecured creditors and the issue of paying any prepetition Service Charges would just be a matter of timing.

**(3)    The Need to Maintain Debtor's Existing Bank Accounts and Business Forms.**

56. As part of the Cash Management System, the Debtor maintains numerous Bank Accounts. Debtor routinely deposits and withdraw funds from the Bank Accounts by checks, wire transfers, and automated clearinghouse transfers. Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require, as of the Petition Date, the closure of Debtor's prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them. The Debtor believes, however, that its transition to chapter

14

11 will be smoother, less costly, and more orderly, and disruption and harm to its Cash Management System will be minimized, if the Bank Accounts are continued following the commencement of its case with the same account numbers; *provided*, *however*, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

57. Unless otherwise ordered by this Court, no Banks shall honor or pay any check issued on account of a prepetition claim. Any bank may honor any checks issued on account of prepetition claims only where this Court has specifically authorized such checks to be honored. Furthermore, notwithstanding anything to the contrary in any other emergency and interim order or other order of this Court, the Debtor requests that the Banks be authorized to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date. The Debtor further requests that the Banks should not be liable to any party for following the Debtor's instructions or representations regarding which checks should be honored.

58. By preserving business continuity and avoiding disruption and delay to Debtor's disbursement obligations, including payroll, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that would otherwise result, absent the relief requested herein, would ill-serve Debtor's rehabilitative efforts.

59. Accordingly, the Debtor requests authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Petition Date.

60. In addition, to minimize expenses, Debtor further requests that it be authorized to continue to use its correspondence and business forms, including, but not limited to, purchase orders, checks, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to its status as debtor in possession. Because all of the Debtor's payments were made out of its bank accounts at the Banks,

to the extent they use those bank accounts for payroll and vendor payments, it is requesting to continue to use such check stock; *provided, however*, that the Debtor shall commence marking "Debtor in Possession" and the chapter 11 case number on its own existing check stock and wire transfer instructions instead of having new stock printed with such marking.

61. If the Debtor is not permitted to maintain and utilize its current Bank Accounts and its existing Business Forms, including check stock, the resultant prejudice will include significant (i) disruption to the Debtor's ordinary financial affairs and business operations, (ii) delay in the administration of Debtor's estate, and (iii) cost to the estate to set up new systems, open new accounts, print new business forms, and print new checks.

G. **Designation of Responsible Person.**

62. I am the Debtor's President and a Manager, and have worked in those capacities since the company was founded in 2018. As a result of the foregoing, I am readily familiar with the Debtor's finances and operations. Additionally, pursuant to the Debtor's corporate resolution authorizing it to file bankruptcy as attached to its *Voluntary Petition* [ECF No. 1] filed in this Chapter 11 Case, I was selected as a designated responsible person for the Debtor in its Chapter 11 Case, and this Motion seeks to implement the foregoing. Accordingly, I am suitable for serving as a designated responsible person on behalf of the Debtor in its Chapter 11 Case.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED: June 16, 2021.

        /s/ Deanna Crossman  
        DEANNA CROSSMAN